Good morning and thank you. When we brought the motion for sanctions at the conclusion of the trial, the first thought that came to my mind was, well this was bad faith from beginning to end. How in the world do I bring that out in a motion to the judge? And then I thought, well who is my audience here? It is the trial judge who read every pleading, heard every argument, made every ruling on the arguments, sat through the three-week trial, ordered the trial transcript afterwards and reviewed the trial transcript, made a hundred and sixty some odd notes from the trial. I thought, well it's not only unfeasible, infeasible, and not possible to put the whole thing in front of her again. We can't reproduce every pleading and the trial transcript for her, but that wasn't necessary. So I thought, well what do I do next? Well what I did is I thought to myself, she really knows everything that happened in this case and I'm sure that if we prompt her recollection she'll remember much of this. So in the motion I brought forth a couple of examples from the most prominent claim that had been brought against my clients. This was the alleged fraudulent transfer of property, which we call the Vero Road property. And I put in the motion two examples of bad faith in that particular claim. And then I directed the court to our post-trial brief. Our post-trial brief was 200 pages long and on the Vero Road property we devoted 36 pages to the Vero Road property claim. In that post-trial brief we identified every line of testimony, we referenced every exhibit that came into evidence, we went through the entire claim and pinpointed every place where number one, they had to produce evidence and there was absolutely no evidence. There was no evidence on any part of the claim. But in addition to that, we also pointed out specific acts of bad faith. And if I may, I'd like to give the court one of those examples because it illustrates how this was bad faith. During the course of the trial, since the the plaintiff, Mr. Gonzales, didn't have any evidence, he tried to exclude our evidence. And we had a lot of documents that we wanted to introduce and which we had produced at the very beginning of the case, before I even got into it. I didn't get into the case until I'd been going for about four or five years. But the documents had been produced. Well, they brought a motion under many to exclude the documents on the basis that they had never been produced timely. They brought that motion not once and not three times. And then in the middle of the trial, they again objected to the production of these documents on the basis that they had never been produced. Well, they not only had been produced, they had admitted they had been produced at the very beginning of the case. And then they kept bringing this motion. The first time they brought it, I thought, this is crazy. So we showed that they were produced. They agreed. We went on. Later, they brought the same motion. I'm saying to myself, what is going on here? We've already fought this battle. We won. The judge even gave us an order on it. When you say there is no evidence, what was the basis for the two adversary complaints? The basis for their claim or our defense, if you will. Well, I'm just wondering what was the basis? How could they proceed if they had no evidence at all? That's a great question. They should never have proceeded. For example, on the Vero Road property, they had to prove that Jay and Debbie Johnson bought the property but put it in the name of Randy and Robin. Well, Mr. Lapidus came forward and he said, well, Jay made the down payment. Okay, where is the evidence that Randy made the down payment? Then they said, well, Jay got the loans on the property. We said, well, where is the evidence that they got the loans? There was no evidence. But we produced lots of evidence that Randy got the loans and he paid the loans. And in those 36 pages in the post-trial brief, which we directed the court's attention to it, we went through every single one of those items where they supposedly said, here's the evidence, or they said, this is the conclusion. They didn't have any evidence. And then we showed there was no evidence. And when we got through, the judge agreed with us. They had not produced any evidence. There were like, I think like 12 different claims in the complaint against my clients. There were two cases. And they had to prove five or six elements for each of those claims. Now, I don't know how many that is, like 50 elements or something. They didn't prove a single element of a single claim because they had no evidence. All that happened is Mr. Lapidus got up there, who was the instigator of this whole thing, and he lied. He would say, well, Jay made the down payment. And we'd say, where's your evidence? And he'd say, well, I don't have any, but I know he made it. Well, if Mr. Gonzalez and Mr. Hines had looked at that and said to Mr. Lapidus, what is your evidence that Jay made the down payment? Because that was the allegation that Mr. Lapidus was making. Mr. Lapidus would have said, well, I don't know, but I know Jay made the down payment. Well, Mr. Gonzalez and Mr. Lapidus should have said, well, I'm sorry, you don't have a claim. This case reminds me very much of the Chambers case, but it's like the mirror image of it. In the Chambers case, the plaintiff brought a claim against the defendant. And as it turned out, the plaintiff had a very good defense, and they never offered anything in defense because they had no defense. In this case, it's just the reverse. The plaintiff, Mr. Gonzalez, brought a claim, and there was absolutely no evidence for the claim. And so at the end of the case, we won. Well, in the Chambers case, it cost the defendant, or the plaintiff, a million dollars to go through his case in which there was no defense. In our case, it cost my clients $2 million to defend against a frivolous case which had absolutely no evidence. Now, I realize there's a difference between not being able to prove your case, you know, you fall short of your burden of proof, and proceeding in bad faith. Now, for example, on the Vero Road property, this is, I think, a great example. Mr. Gonzalez, the trustee, said, well, I brought the case on the Vero Road property because I discovered from the tax returns, Jay and Debbie's tax returns, that they were taking the mortgage interest deduction on the property, which would be an indication that they're the owners of the property and not Randy and Robin. Well, he testified to that in his trial declaration under penalty of perjury, that he discovered that they were taking the mortgage interest deduction from looking at their tax returns. Well, they had the tax returns for 96, 97, 98, 99, and 2000, because the property was purchased in 95, and they had those five years' worth of tax returns, and there was no taking of the mortgage interest deduction on the tax returns. It wasn't there. So how in the world could Mr. Gonzalez testify, I saw the tax returns, I saw they took the mortgage interest deduction, that led me to believe that they were lying about, you know, who owned the property. And so he files the claim and makes my client go through all of the trial to show that there isn't anything. All the tax returns were produced, and he had them at the very beginning during the meeting of creditors. Now, yes. Let me ask you to shift ground a little bit. To prevail on your motion, you had to show bad faith, right? Yes. What is the evidence of bad faith? Well... Aside from the fact that, you know, I don't think the fact that you believe they had no cases itself, per se, bad faith. I understand, and I fully agree with that. The bad faith has to be shown from the conduct that they engaged in. And it has to be, excuse me, it has to be either bad faith, which is, you know, some malevolent or malicious design that they have in mind, or vexatious, which is to harass somebody, or wantonly made to be mean or cruel, or there has to be some kind of oppressive reason like, we're going to make this so unreasonable, so expensive for you that you're going to capitulate to our demands and pay us so that you can get out of this. All of those, I think, were demonstrated in their conduct. For example, with respect to the trying to exclude our documents from evidence. Why would they bring this same motion two and three times, and at the time of the trial, try to exclude those documents when the judge had already issued an order that they were admissible, and make us go through, it wasn't just one document, it was a whole bunch of documents, and make us go through all that if they didn't want to just harass us, just make it so expensive for us that we would finally say, uncle, we give up, we quit. Well, how could the court... This was a voluntary petition for bankruptcy, right? Yes. So, I don't understand that argument, because the trustee was trying to enlarge the estate by arguing that your client had made the down payment on a thing and needed to disgorge it. Jay and Debbie filed a voluntary petition of bankruptcy, and Mr. Lapidus, who was a creditor, and we'd kind of detailed his... He'd been at odds with the Johnsons for many years. This is over the fact that Johnson sold them the property that didn't have benefits to water. Mr. Lapidus is the one who said, well, that's a fraudulent transfer, and they didn't put that virile property on their schedules, as well as the LaForest Drive property, as well as another business. I mean, he had... His report was 400 pages and 3,000 exhibits, and we went through it on nine days of cross-examination, and he couldn't prove one single item. His report was... It was trash. We had a CPA come in and said, you know, we can't make any sense of this thing. But, to come back to your question, the... Or your question, I'm sorry. Mr. Lapidus went to Gonzales and Hines and said, they have defrauded the bankruptcy court. They have not listed property that they owned, and it's... There have been these fraudulent conveyances. Vero Road, for example, he was saying Vero Road was really owned by Jay and Debbie. It should have been included in their bankruptcy schedules. The LaForest Drive property should have been included in their They said, well, those are really Jay's businesses. They should be included in the schedules. And so, that was the basis for the claim that Mr. Gonzales brought was to prove that those transfers were fraudulent, bring them back into the estate so that they would be available for Mr. Lapidus, who was the only claimant that was claiming anything in the bankruptcy. Jay really paid off virtually every other debt that he had. Mr. McCullough. Yes. I read the excerpts of record. It looked to me like the bankruptcy judge here was struggling with... She found that you had that the non-dischargeability issue, but she says... And what you said at the outset about how she detailed all of the work that she'd done, are we under a standard of clearly erroneous here? When we look at... Does the court of appeals have to say the judge was clearly erroneous when she found no bad faith? Yes. Okay. So, here's what she says in the excerpts of record. She explained that she had to explore whether that translates into bad faith and ultimately concluded that she could not make that leap. I'm at excerpts of record 38. I just didn't have the dots connected from, you know, judgment in favor of the defendants to, well, this case should never have been brought. Doesn't she clearly say that it's not a good case, but I can't get there to... To me, bad faith borders on intent, doesn't it? Well, two points in response to that first. First of all, she really was saying in her ruling, you didn't give me the evidence, so I couldn't look at it. Well, if we didn't give her the evidence and she didn't look at it, she can't make that conclusion. Second, in making the conclusion, it doesn't make sense. For example, on this trying to exclude the documents, it is illogical for the court to conclude that there was no bad faith in bringing this motion two and three times. That is illogical. It's senseless. It's devoid of any kind of logic. It is implausible. It's not worthy of belief that that is not in bad faith. It provokes a disbelief, actually, especially when there are no inferences that can be drawn from the facts in the record to suggest that the action was taken in good faith. What really should have happened here and what we tried to get was an evidentiary hearing in which we could get Mr. Gonzales or Mr. Hines on the stand. And this is what I absolutely believe is mandated and should have happened. Came on the stand and say, you first claimed that these documents are not being produced timely. You then admitted that they were, and I ordered that they could come into trial. Then you brought another motion to exclude them on the same basis, and we denied that motion. Then you brought another motion, same thing. Why did you do that? What is the explanation? The only conclusion I think that can come from that is that they did it to harass us, to make it expensive for us. It was done in bad faith. They had no hope of ever having the judge say, I'm going to exclude the documents after they had admitted that they were produced timely, I mean, that doesn't make sense. And we have dozens, scores and scores of instances of things just like that throughout this trial, which we could not just, well, if the court wanted us to do a supplemental brief, and put all that in there, we could do it, but it would be horrendous. And besides, she's got to remember some of these things. I know what she said, but it doesn't make sense to me. Number one, she says, well, you didn't give me enough evidence, so I couldn't really look at it. And second, it's illogical, it's implausible, and there's nothing in the record to indicate that it was in good faith. I'd like to reserve a couple of minutes, I think I may be over my time here. You are over your time, but I'll give you a minute. Thank you very much. Good morning. I listened to Mr. McCullough speak here for the last 15 minutes, and I was amazed by the fact that he was arguing what appeared to be an appeal from the result of the trial, not the motion that was brought to Judge Smith seeking attorney's fees. I think today we have to start with that motion, because the local rules require that when you file a motion in the central district, you provide the court with all the evidence, pinpoint references to what it is you want, and what you want the court to rule on in deciding the motion. If you look at the excerpts of record and look at Mr. McCullough's motion, it is vague, it is general. It fails to indicate the things he was just talking about. There are no references to Vero Road, no references to documents that may have been produced or not produced. All those things were done as part of the trial or part of the pretrial, but his motion was based on allegations of bad faith, and it was supported by only his declaration and no pinpoint citations to the record. So he left Judge Smith with an empty box, without any of the materials necessary to make the findings required by the Ninth Circuit under Section 105A of bad faith conduct on the part of the trustee and the trustee's counsel. So I say the motion was properly denied, because as you pointed out, Judge Smith said on the record she reviewed her 161 pages of personal notes from the trial. She said on the record she had reviewed the oral transcript, turned into a written transcript from the three weeks of trial, and she could not connect the dots because the motion itself on its face was deficient to reach the Ninth Circuit requirement of bad faith, malafides, or whatever the standard is. Now, I understand that Mr. McCullough wants to argue a motion that was not brought. He wants to argue things that may have been in his post-trial brief, but none of those things were properly before Judge Smith when she heard this motion. But Judge Smith did hear the entire 10 years of litigation? Exactly. She did, and she was very much familiar with the conduct of all counsel and the trustee during the entire 10 plus years of the life of this case. And during the life of this case, at no point did she find that the trustee and trustees counsel had ever, ever acted in bad faith. She ruled on motions for summary judgment. She ruled on motions in limine. And at no point in time did she decide, say, or infer that the trustee and trustees counsel had acted in bad faith. So I think you're right. She looked at and lived through the record, and as she said during the hearing, I cannot connect the dots based on what you've put before me, and the motion was properly denied. Now, if Mr. McCullough and the appellants wanted to have a hearing where evidence would be presented, and as I looked at his briefs this week, he refers alternatively to bad faith conduct and malicious prosecution. In order to get to the malicious prosecution, he would have had to file an adversary proceeding or a complaint. He didn't do that. He simply filed a simple motion. If he wanted to have an evidentiary hearing, he could have issued an order to show cause to Judge Smith seeking sanctions under 105. He didn't do that. He didn't follow the tools, the pathways that would have gotten him to the evidentiary hearing that he now says he so richly deserved and requested at the hearing. He simply filed a motion, a very simple deficient motion, and Judge Smith gave him an hour and a half, even taking leave from the courtroom to go back and look at the chamber's proceedings that weren't even mentioned in the motion itself but brought up only during oral argument. She left the bench, tried to find the chamber's briefs, underlying procedures and briefs, to answer Mr. McCullough's request that chambers somehow control how this motion should be decided. And again, after all of that work, she decided correctly, exercising her discretion, that the motion itself was deficient. So I don't think we need to run down the rabbit hole of all of the things that Mr. McCullough says were in his post-trial brief, because his post-trial brief was not in front of Judge Smith. It had not been pinpoint sighted, attached as an exhibit, and given to the court and said, if you look at pages 20 through 30, you'll see all of these examples. He didn't do that. And without that, he didn't give the judge the tools to build the box in which he wants to put his 105 case. Mr. Hines, even if he didn't procedurally do it right, isn't bad faith kind of like, I know it when I see it, and this judge had lived with the case for, it looked to me like for 15 years. It started in 01, and we're talking about a 2016 ruling. Correct. Wouldn't she have known bad faith, vexatious, oppressive conduct just as a matter of course or not? I mean, when you see misconduct as a judge, I think most of us at least have some sense about what that is. I agree with you. And the inference then is that because she lived with this case, through the motions for summary judgment, a failed settlement, which she had originally approved and then undid, she found at no point in time any bad faith on the part of the trustee and trustees council. I just don't see how we get to the 105 malefides intent that is required by the Ninth Circuit case law to find in favor of the other. Well, did Judge Smith indicated at all that she had any problems understanding the motions? I mean, she knew what was going on, right? Well, her only- She didn't say anything that the motion was deficient. No, no, she didn't. You didn't cite enough instances and so forth, right? She did say as part of the record at the hearing that Mr. McCullough had failed to pinpoint, cite her to the evidence necessary to make the findings. She did say that, and then she did leave the bench to look at the chamber's briefs. Well, you said she did say that, but ultimately, she didn't depend on that point in making a ruling, did she? It doesn't appear so. She simply found that the motion was deficient. Mr. Hines, when you say the chamber's- Excuse me. I don't think that the motion was deficient, that she didn't agree with the motion on the basis of her understanding of the record. Correct. She found the record was not supportive as it was presented to her under the local rules to make the finding under 105. Yes, sir. Mr. Hines, when you say the chamber's brief, you're referring to the case of Chambers, the 1990 case? Right, yes. So she went and looked at the case? Is that what you're saying? Yes, she left the bench. She said she was going to go back and see if she could find either the briefing or some other evidence on the Chamber's case. Thank you. So I have a small technical question. So you brought a motion, or somebody brought a motion to compel enforcement of the 2005 settlement agreement. And the court ultimately held that that agreement was unenforceable. But why wasn't the money spent defending that motion in action on a contract for purposes of California Civil Code Section 1717? Your Honor, it may well have been. There was an attorney's fees clause in that. Right, so wouldn't they be entitled to attorney's fees, at least on that? If they made the appropriate motion under California law under 1717, the judge would have the discretion to award fees or not. There's two problems. The appellants never made that motion in 2006 when Judge Smith undid her approval of the settlement. Statute of limitations on that is clearly gone. And the court did say, sua sponte, that that claim was barred by latches because it had lapsed because it hadn't been brought between 2006 and 2016. So while that may have been true, that motion was never brought appropriately so the judge could rule on it. I thought that was an issue in this case. You mean it was an issue on appeal, but it wasn't raised in the bankruptcy court? Well, the way this was done, Your Honor, the trustee obtained approval of the settlement brokered by Judge Mitchell Goldberg. We brought that motion to Judge Smith. She struggled over it and granted it. Mr. McCullough came into the case on behalf of the appellants, moved for reconsideration, and a year later she undid the settlement. So that all happened between 2004 and 2006. The issue you raise is if there was a right to attorney's fees for undoing the settlement, that cause of action would have existed in 2006 but lapsed because it wasn't brought in time. And the judge on her own said, well, you waited so long, there's latches. Where did the judge say that? It's in the record, Your Honor, and I might be able to cite you to that actual language. Yeah, I'd like to see where the judge said that. Because my understanding is that maybe the pendency of the bankruptcy proceedings would toll the time in which to bring that motion, such that they would bring it at the end of the proceedings. It's one big proceeding, right? It is one big proceeding, but it has broken up parts. We've been to the Ninth Circuit at least twice during the course of this case on various issues. While the underlying bankruptcy continued, the prosecution of Gonzalez 1 and Gonzalez 2 went through some ups and downs in the appellate process, never at the insistence of the trustee, always at the insistence of the Johnsons. But the point is, if they had wanted to bring that motion for attorney's fees, they should have brought it in a timely fashion, and they failed to do it. They still haven't brought that motion as of today. The attorney's fees motion that was brought, when you look at the motion that was brought by the appellants before Judge Smith, it seems to have two vague components. There is this reference to the undoing of the settlement and potential 1717 claims. But Mr. McCullough argues that's because there were 2001-1999 agreements between Mr. Lapidus and the Johnsons. These are all things that were prior to the bankruptcy. Issues between the Johnsons and Lapidus has nothing to do with the trustee. Judge Smith ruled that the only party appropriately part of the trustee of the attorney's fees motion was the trustee and the trustee's actions. So as to the 1717 arguments, for all those prior Lapidus-Johnson agreements, that was not appropriately before her. So the only issue is the settlement agreement. And the judge did indicate that, on her own, latches was an issue there. If I could find that, I will certainly cite it to you. I recall it being part of the record. I just can't put my finger on it at this moment. Do you want to? All right, does anybody have any other questions? I don't. Do you want to just sit down and try to find that site for me? And I'll give your opposing counsel a minute. I will do that. Thank you. Thank you. Just very briefly, Your Honor. With respect to the 2005 settlement agreement, it has an attorney's fees provision. They brought a motion to enforce that contract. The court granted it on motion for reconsideration. When I came into the case, the court reversed herself and said, no. We brought, at the end of the trial, we brought a motion for fees with respect to that motion alone, separate. $148,000 were the fees, just simply to defending against that motion and prevailing. So they brought the motion. It was granted. It was reversed. We prevailed. And on that contract issue, it has nothing to do with the prior agreements between Mr. Lapidus and the Johnsons. It has nothing to do with that. It is a separate item. And it was brought in the bankruptcy case. And the bankruptcy case is still open. And so there is no statute of limitations issue. There really is no latches issue, because we didn't have to bring it when we did. We could still be bringing it. But we brought the motion. And the judge, Sui Spani, said, well, you waited 10 years. That's latches. Well, number one, that's an affirmative defense. They never brought up that as a defense. Number two, the judge never made any findings that would have supported latches. So that alone has got to be reversed, so that the judge can go back and say, OK, they brought the motion. And you prevailed. Can you tell me where in the record the motion is? I know it's referenced. You're going to have to tell me where that motion is, because I'm not going to go through 15 years of a record to find it. Well, I'll take a look at my brief, because I think that we identified the docket numbers with respect to those motions. Second, if the court did recall, like Mr. Hines was saying, did recall everything that went on, and she never thought that there was bad faith and so forth, and at the end, she says, well, I don't think I find any bad faith here. If that's the case, she either abused her discretion, or she is simply wrong. And this court can reverse that. You cannot say, Mr. Gonzalez, you testified that you found the tax returns said there was a mortgage interest deduction taken, when in fact the tax returns don't show that. And you said it under penalty of perjury. You can't make that mistake. You've got to explain that to the judge, how she can say, I don't find that to be bad faith. I don't find her response is implausible. It doesn't make sense. You have to say, what happened here? And that's why I think we need an evidentiary. You're over your time, so thank you. Thank you. Very much. Were you able to find that site? I was not, Your Honor. I apologize. But both Mr. McCullough and I seem to recall the latches issue. Right. That's correct, yes. That seems to have been the case. So what's your response to latches? Again, on the issue of latches, it is an affirmative defense, which a defendant has a right to bring. The question is whether Judge Smith has the discretion, sua sponte, to raise that issue in light of her 15 years of history with the case. I think she exercised her discretion appropriately, and that's how the case should be disposed. All right, thank you, counsel. Gonzales versus Johnson will be submitted.
judges: Tashima, Wardlaw, Pratt